**RALEIGH–DURHAM AIRPORT AUTHORITY, Plaintiff,**

v.

**DELTA AIR LINES, INC., et al., Defendants.**

No. 75–0298–Civ–5.

United States District Court,
North Carolina,
Raleigh Division.

Sept. 7, 1976.

As Amended Sept. 8, and Oct. 7, 1976.

A. L. Purrington, Jr., and Edwin B. Hatch, Purrington, Hatch & McNamara, Raleigh, N. C., for plaintiff.

E. Lawrence Davis, III and Jimmy H. Barnhill, of Womble, Carlyle, Sandridge & Rice, Winston-Salem, N. C., and John J. Geraghty, of Poyner, Geraghty, Hartsfield & Townsend, N. C., for defendants.

## MEMORANDUM OPINION

HEMPHILL, District Judge.

This is a consolidated action, formerly consisting of one suit filed in the United States District Court in 1974, and another filed in the Superior Court for Wake County, North Carolina in 1975 (later removed to this court) in which the plaintiff seeks to collect landing fees and rental charges from the various defendant air carriers using the Raleigh-Durham Airport. It is undisputed that the plaintiff and each defendant previously entered into a lease-landing fee agreement for the payment of landing fees on the basis of weight and number of landings, effective July 31, 1971. The amount of the landing fees charged in such agreement was:

> The charge of thirteen cents (13 cents) per thousand pounds (or fractional part thereof) of airplane weight, for each and every airplane landing at the airport, except non revenue flights engaged solely on an inspection or promotional aircraft testing mission, the weight of each plane to be calculated by taking the maximum allowable landing weight at the Airport as fixed by the Federal Aviation Administration.[1]

Also undisputed is the fact that since the date of the original agreement, each of the airlines (denominated hereafter as Delta, Eastern, Piedmont and United) have used the airport since that time and continue to

---

1. Paragraph 9 of the original agreement, June 15, 1970.

use up to and including the date of the trial of this action until the present time.

## CHRONOLOGY

On July 2, 1974, the plaintiff filed in this court a civil action then designated as No. 74–169–Civ–5, Raleigh Division, demanding judgment against Delta in the sum of $26,-714.99 plus interest, against Eastern for $202,986.47 plus interest, against Piedmont for $46,020.46 plus interest, against United for $39,035.61 plus interest and for costs. This action was processed in this court until its consolidation, on January 25, 1976, with the present action, designated as No. 75–298–Civ–5.

The original complaint 75–298–Civ–5 was filed in the Office of the Clerk of Court for Wake County, North Carolina, on August 20, 1975. On September 18, 1975, a petition for removal of the cause, accompanied by appropriate documents including a removal bond, effectively removed the case to the United States District Court for the Eastern District of North Carolina, the Raleigh Division. On September 19, 1975, each of the defendants filed its answer and accompanying papers, including a copy of the lease agreement and certain letters and/or correspondence between the parties, as attachments to the separate answers. On November 25, 1975, plaintiff filed its motion to consolidate the two actions, which was followed on January 19, 1976 by a response by the defendants to the motion to consolidate, and by the order of consolidation heretofore noted, on January 25, 1976.

On February 25, 1976, this court filed its order denying all motions to abstain and remand, and setting a pretrial in the cause for May 17, 1976 at Raleigh and the trial at the same location on June 14, 1976.

On May 28, 1976, plaintiff filed a two-count amended complaint, and on the same day defendants filed an amended answer. After the usual allegations of residence,[2] plaintiff alleged, in paragraphs 4, 5, 6, 7 and 8, that in June of 1973 plaintiff, pursuant to the powers granted to it as a municipal corporation, in Chapter 168, Public-Local Laws of 1939, as amended, under Article 6, Chapter 63 of the General Statutes of North Carolina, notified defendants it had adopted, and was placing into effect a new schedule of landing fees at the Raleigh-Durham Airport effective October 1, 1973, as follows:

> The rate of 34 cents per thousand pounds (or fractional part thereof) the maximum allowable landing weight for each of defendants' aircraft landing at plaintiff's facility, except for nonrevenue flights, etc.
>
> Six dollars per year per square foot rental for inside and outside space at the terminal building.

The first count further alleged that the defendants had been notified of the changes on June 21, 1973, but since October 1, 1973, had continued to operate at the Raleigh-Durham Airport while refusing to pay any of the landing fees which became effective on that date. The complaint also alleged that the parties had agreed, without prejudice to the rights of the parties, that defendants could continue to use the airport facilities and pay on the basis of the rent schedules effective July 31, 1971, until the controversy over the raised landing fees was decided.

Paragraphs 10, 11, 12, and 13 alleged the specific amounts plaintiff claimed as due from each of the carriers, and paragraph 14 contained a general indebtedness allegation.

The second count of the complaint contained an alternative claim incorporating most of the paragraphs of the first count. Count two reiterated that by letter of June 21, 1973, each carrier was advised of the new rates and charges effective October 1, 1973 and that for the period from October 1, 1973 through May 31, 1973, each defendant had failed and refused to pay the charges, but it also alleged that defendants were indebted to plaintiff for reasonable compensation for the use and occupation of the facilities owned and operated by the plaintiff. A prayer for damages followed.

**2.** Treated hereinafter under jurisdiction.

In their amended answer, defendants admitted that the rates had been raised and that they had failed to pay, but denied liability for the increased payments. In the second defense defendants pleaded that they, having continued in occupancy of the premises, continued in effect as tenants from year to year and pled that each, as a tenant from year to year, not having been given a notice to quit the premises, and in the absence of an agreement between the parties, was not liable for the increased charges, which defendants described as "more than 250% of the rates specified in the said (original) Lease and Use Agreement, as continued in effect as tenants from year to year." The third defense pleaded the unconstitutionality of the statutes upon which plaintiff relied, as did a fourth defense.[3] A fifth defense pleaded that the landing fees sought to be collected by plaintiff, constituted an unlawful and unconstitutional burden upon interstate commerce in violation of Article I, Section 8, Clause 13 of the United States Constitution. A sixth defense pleaded that the rates sought to be charged are unlawful in that such rates and charges exceeded the amounts plaintiff was authorized and empowered by law to establish. The usual prayer for relief followed.

A pretrial was held as scheduled before United States District Judge Frank T. Dupree, Jr., at Raleigh, and trial commenced at Raleigh on June 14, 1976, and was completed on June 16, 1976, whereupon counsel were advised to submit proposed findings and/or authorities on or before August 10, 1976, and an oral hearing was scheduled for August 17, 1976.

## JURISDICTION

It is obvious that the Raleigh-Durham Airport Authority has a separate claim against each of the defendants and that as against Eastern Air Lines, a Delaware corporation, with a resident agent appointed in North Carolina, Delta Air Lines, also a Del-

aware corporation with a resident agent appointed in North Carolina, and United, also a Delaware corporation with a resident agent appointed, diversity jurisdiction exists. It is admitted by all parties that Piedmont Aviation, Inc. is a North Carolina Corporation with its principal office and place of business at Winston-Salem, North Carolina. Admittedly, the amount in controversy as to each of the defendants is more than $10,000. Plaintiff therefore made a motion to remand the case to the Superior Court of Wake County because of lack of diversity jurisdiction, in that plaintiff and defendant Piedmont were both "residents" of North Carolina. 28 U.S.C. § 1447(c) provides:

(c) If at any time before final judgment it appears that the case was removed improvidently and without jurisdiction, the district court shall remand the case, and may order the payment of just costs. A certified copy of the order of remand shall be mailed by its clerk to the clerk of the State court. The State court may thereupon proceed with such case.

Ordinarily, "the right to secure remand when a federal subject matter jurisdiction basis for removal is absent cannot be waived. As is true of original federal court actions, a district court is required to notice and determine the existence of federal question or diversity of citizenship jurisdiction in a removed case on its own motion when not raised by one of the parties." 14 Wright, Miller and Cooper, *Federal Practice and Procedure*, § 3739 at 756–57; *Warren G. Kleban Engineering Corp. v. Caldwell*, 490 F.2d 800 (5th Cir. 1974); *Armstrong v. Armstrong*, 508 F.2d 348 (1st Cir. 1974); *Burgess v. Charlottesville Savings & Loan Ass'n*, 477 F.2d 40 (4th Cir. 1973).

In this case it is apparent that the court and the parties relied on 28 U.S.C. § 1441(c) as authorizing federal jurisdiction. The section provides:

---

**3.** Initially, this claim was predicated on the alleged constitutional infinity of vagueness of the statute (North Carolina General Statute 63-

53(5)) but this was withdrawn in the post-trial arguments at Raleigh.

Whenever a separate and independent claim or cause of action, which would be removable if sued upon alone, is joined with one or more otherwise non-removable claims or causes of action, the entire case may be removed and the district court may determine all issues therein, or, in its discretion, may remand all matters not otherwise within its original jurisdiction.

The claim against Piedmont Airlines is not alone properly removable to this court, but the claim against each of the other carriers is a proper subject matter for this court, diversity jurisdiction existing.

■ Section 1441(c) was enacted in 1948, and one district judge catalogued the cases decided thereunder prior to 1960 by stating "it is not an exaggeration to say that at least on the surface the field luxuriates in a riotous uncertainty." *Harper v. Sonnabend*, 182 F.Supp. 594, 595 (D.C.N.Y. 1960). Unfortunately, the decisions rendered in the past 16 years have done little to dispel this uncertainty. The most authoritative interpretation of Section 1441(c) is provided in *American Fire & Casualty Co. v. Finn*, 341 U.S. 6, 71 S.Ct. 534, 95 L.Ed. 702 (1951), and it is true that many commentators consider *Finn* to have rendered almost all diversity cases unremovable under Section 1441(c). Nevertheless, this action appears to be one of those rare diversity cases which does meet the statutory criteria as construed in *Finn*. Plaintiff's claims against Delta, Eastern, and United may indeed be considered separate and independent from the claim against Piedmont and would be removable if sued upon alone. The respective claims are separate causes of action, rather than simply separable controversies, and they retain sufficient independence to render removal consistent with what the Court in *Finn* identified as a congressional intent "to require more complete disassociation between the federally cognizable proceedings and those cognizable only in state courts before allowing removal." 341 U.S. at 12, 71 S.Ct. at 539. The court is therefore justified in concluding that the entire action, involving plaintiff's claims against all four defendant airlines, is removable pursuant to 28 U.S.C. § 1441(c).

■ After the removal of an entire case, Section 1441(c) provides the district court with discretion to determine all the issues in the case or to remand all matters not otherwise within the court's original jurisdiction. The only matter in this action which could be remanded to state court is, of course, plaintiff's claim against Piedmont. Since there is no conceivable justification, however, for the piecemeal litigation which would result from such a remand, this court will not hesitate to exercise the jurisdiction available to it to determine all the issues in this case. The parties have agreed that this is the most desirable course of action and, although their consent was irrelevant to the court's determination of whether jurisdiction existed, it was accorded the substantial weight it deserved when the court considered the question of remand.

## STIPULATION

At the final pretrial conference, the parties agreed that a number of facts were not in dispute and that the stipulation which follows should be included in the Order on Final PreTrial Conference filed by Judge Dupree on June 1, 1976:

(a) Raleigh-Durham Airport Authority is a "municipality" within the meaning of Chapter 63 of the General Statutes of North Carolina, created and existing under and by virtue of Chapter 168 of the Public-Local Laws of 1939, as amended, and is engaged in the operation and maintenance of Raleigh-Durham Airport in a proprietary capacity.

(b) Delta Airlines, Inc., Piedmont Aviation, Inc., Eastern Airlines, Inc. and United Airlines, Inc. are air carriers providing regularly scheduled airline service utilizing the facilities of Raleigh-Durham Airport.

(c) The following types of aircraft use the Raleigh-Durham Airport facilities:

(1) Scheduled air carriers.

(2) Non-scheduled air carriers.

(3) Military.

(4) General aviation.

The rates charged users of the Raleigh-Durham Airport facilities other than the scheduled air carriers are different in amount and determined in a manner different from the rates charged the scheduled air carriers.

(d) The increase in the rates charged the commercial air carriers from 13 cents to 34 cents per 1,000 pounds and to $6.00 per square foot were agreed upon by members of the Airport Authority in June, 1973 on the basis of telephone conversations among members of the Authority, without a formal meeting of the Authority. There was a concurrence at the July 10, 1973, meeting of the Authority with respect to such increases and an entry to that effect appears in the minutes of such meeting. The air carriers were not given prior notice of the Authority's intention to set such rates at 34 cents per 1,000 pounds and $6.00 per square foot.

(e) The defendants are the only regularly scheduled air carriers serving and utilizing the facilities of the Raleigh-Durham Airport.

(f) That gross landing weights are computed monthly by plaintiff for each defendant on the basis of information furnished to plaintiff by each defendant covering operations at Raleigh-Durham Airport during the preceding month. Maximum allowable landing weights for each type of aircraft are those fixed by the Federal Aviation Administration.

(g) That landing fees and terminal rental rates established by plaintiff must meet both the standard of reasonableness set forth in Chapter 168 of the Public-Local Laws of 1939, and amendments thereto and the standard of reasonableness set forth in Article 6 of Chapter 63 of the General Statutes of North Carolina.

(h) That all regularly scheduled air carriers are charged the same landing fee, regardless of the origin and destination of flights.

(i) Each of the defendant air carriers entered into written lease and use agreements with the plaintiff, which said agreements provided for a termination date of July 31, 1971. Under the provisions of Article 3 of each of the agreements described above, each defendant respectively agreed to pay various rental charges for the different categories of rental space occupied by that defendant, and a charge of 13 cents per 1,000 pounds of airplane weight for every airplane landed at the Raleigh-Durham Airport by that defendant. Each party to these agreements performed all the duties and obligations imposed thereunder. At no time thereafter have plaintiff and any of the defendants entered into a new written agreement. On June 21, 1973, R. Dillard Teer, as Chairman of the plaintiff, notified the defendants by letter that the plaintiff had increased the landing fees and rentals payable by the defendants beginning October 1, 1973, to 34 cents per 1,000 pounds landed weight and $6.00 per square foot for inside and outside rental space. At no time since June 21, 1973, have plaintiff and defendants been able to reach agreement on the issue of landing fees and rental charges.

(j) The following items are proper to be included and considered in computation of reasonable landing fees:

(1) Maintenance and operation expenses attributable to the air field, including revenues from general aviation (fuel sales, tie-downs, hangars, parts sales, service and repair).

(2) Depreciation of air field improvements paid for by local funds.

(3) Interest factor on local investment in air field and air field improvements at long-term interest rate payable or available to the Raleigh-Durham Airport Authority.

(4) Deferred maintenance reservice.

(k) The following items should not be included or considered in the computation of reasonable landing fees:

(1) A return to the Airport Authority on the current fair market value of land used in the air field.

(2) A return to the Airport Authority based upon prevailing bank interest rates.

(3) Anticipated actual construction costs, including grading, filling, paving, installation of lighting painting, striping, installation of air traffic control facilities

for major capital expansion improvements on air field which have not been completed and placed into service.

Upon the credible evidence presented, including the stipulation, exhibits, and testimony offered, this court now publishes its

## FINDINGS OF FACT

1. The landing fees and rental charges at issue in this action were sought to be imposed by plaintiff commencing October 1, 1973, and continuing until the present. Such landing fees were sought to be increased effective such date from $.13 to $.34 per thousand pounds of the certificated maximum gross landing weights of defendants' aircrafts. The rental charges for terminal facilities are sought to be imposed on the basis of $6.00 per square foot.

2. The landing fees charged users of Raleigh-Durham Airport facilities other than defendants are different in amount and determined in a manner different from the rates charged defendants. There is no dispute in this case with respect to the landing fees or other fees charged any class of users other than the defendants.

3. Since October 1, 1973, defendants have paid to plaintiff landing fees and rental charges equal to those charged under the agreement in existence prior to October 1, 1973. Such landing fees were imposed prior to October 1, 1973, on the basis of $.13 per thousand pounds of the certified weights of the defendants' aircrafts and the rental charges were imposed on a square foot basis, the rate per square foot varying in accordance with the type facilities used. Defendants' payments in an amount less than that demanded by plaintiff were made, by agreement of the parties, without prejudice to any then-existing rights of any party.

4. Plaintiff Raleigh-Durham Airport Authority was created by and exists under and by virtue of Chapter 168 of the Public-Local Laws of 1939, as amended (hereafter "Local Act"). Its sole business is that of operating and maintaining Raleigh-Durham Airport.

5. At all times pertinent to the controversy, the Airport has been governed by a joint board, the members of which are appointed by the governing bodies of the Cities of Raleigh and Durham and Wake and Durham Counties. The members are not elected directly. Each City and each County appoints two representatives to such board. Title to Airport property is vested jointly in the two Cities and two Counties.

6. At the time of the purported increase in landing fees to $.34 per one thousand pounds landing weight and the purported increase of rental charges to $6.00 per square foot, and thereafter at the time such actions were confirmed and ratified, the members of the joint board were as follows: R. Dillard Teer (Chairman); Frank A. Daniels, Jr. (Vice Chairman); A. Collidge Elkins (Secretary); James T. Kilgore (Treasurer); Dr. Kenneth A. Podger, Wallace N. Mitchell, R. D. Adams and James M. Peden, Jr.

The members of the joint board were all prominent and well respected citizens of the cities and counties by which they were appointed. As a whole, the board is an experienced one with a majority of its members having served 5 years or more.

7. Defendants Delta, Piedmont, Eastern and United are air carriers providing regularly scheduled airline service at the Raleigh-Durham Airport. They constitute all of the scheduled air carriers. In addition to the scheduled air carriers, the following types of aircraft use the Raleigh-Durham Airport facilities:

(a) non-scheduled air carriers (essentially charters);

(b) military;

(c) general aviation.

Based upon the frequency of landings multiplied by average landing weight of each aircraft landed, air carrier landings by defendants' airplanes at Raleigh-Durham Airport account for 72.4% of the total weight landed at the Airport annually. Landings of general aviation aircraft account for 27.6% of the total weight landed annually.

8. The Raleigh-Durham Airport is located approximately halfway between Raleigh and Durham. This facility predates World War II. Pursuant to the Local Act, the two Cities and the two Counties purchased approximately 900 acres of land. During World War II, this land was used and run by the Corps of Engineers. The Corps purchased approximately 900 additional acres of land which was conveyed after the War to the Cities and Counties. Since such time, the Airport Authority has expanded until it now is comprised of approximately 4,000 acres.

Facilities at the Airport include a 4,500 foot cross-wind runway (14/32) and a 7,500 foot primary runway (5/23). In addition, there is a passenger terminal, a cargo terminal, parking lots, and various general aviation hangars. The shorter runway, Runway 14/32, is used primarily by general aviation. Runway 5/23 is used both by commercial and general aviation.

9. The Airport Authority owns certain land upon which are located the two runways and accompanying aprons and taxiways. Other areas include the terminal area, the general aviation area and area across Morrisville Road in which are located various ancillary businesses.

Located in the terminal area are the ticket counters and other space leased by defendants, a waiting area, a restaurant, rent-a-car booths, and other businesses typically found at airports. The Federal Aviation Administration also rents space in the terminal which it uses in connection with performing its various functions, such as traffic control.

Also located at the Airport is the Triangle Motel and an air freight building. In the general aviation area are located a number of buildings, including fixed base hangars. A number of services are provided to general aviation in this area, including the sale of fuel, oil and supplies and the rental of hangar space.

The Airport Authority provides a number of services including maintaining fire, crash and rescue equipment, runway lights and security. The Airport Authority also provides employees who administer the Airport.

10. The financial operations of the Airport are much akin to those of typical businesses. They are somewhat complicated by the payment to the Authority of Federal and State funds.

The terminal tenants and some of the fixed base tenants pay rent for the use of the facilities occupied by them. Some pay fixed rentals, others percentage rentals and still others a combination fixed and percentage. These contracts are negotiated on the basis of the Authority's obtaining the maximum rate such tenants would agree to pay.

No landing fees as such are assessed against general aviation on the theory that general aviation, through the payment of hangar rentals and tie-down fees and the purchase of fuel and other products, pays for the facilities provided to it. Non-scheduled air carriers are charged on a negotiated basis.

11. The Airport Authority, like other airport authorities throughout the country, has issued revenue bonds for the purpose of obtaining needed funds. Seven hundred and fifty (750) revenue bonds in the aggregate amount of $750,000 were issued in November, 1960. Most of these bonds have been retired or refunded. An additional 600 revenue bonds in the aggregate amount of $3,000,000 were issued in May, 1972. These bonds have varying maturity dates and mature in varying annual installments until 1985. The amount of annual interest due on such bonds varies from 3¾% to 5%.

The amounts due in repayment of the bonds for the years indicated were and are as follows:

| | |
|---|---|
| 1974 | $211,000 |
| 1975 | $232,000 |
| 1976 | $234,000 |
| 1977 | $251,000 |
| 1978 | $257,000 |

Interest payments on such bonds vary from year to year. Bond interest payments have been for the years indicated:

| | |
|---|---|
| 1973 | $95,683 |
| 1974 | $170,933 |
| 1975 | $147,903 |
| 1976 | $151,892 |

The original issue of the 750 revenue bonds was for the purpose of purchasing land now on the southern portion of the property in anticipation of expansion in that area. Such planned expansion never materialized. The May, 1972, issue, was for the purpose of obtaining funds to buy land which the Airport Authority plans to use in the event that Plan B, discussed hereinafter, is ever implemented. Land purchased with such funds is generally located along the northwestern portion of the Airport property.

12. Since 1965, the Raleigh-Durham Airport has been consistently profitable. Its total revenues have exceeded its total expenses each year. The Airport is able to meet all current obligations and is generally in sound financial condition. Its overall profits during past years have enabled it to accumulate a reserve fund in the amount of approximately $4 million to finance future expansion of Airport facilities. The fund at present is largely available and intended for use in connection with a substantial overall expansion program which has been in the planning stage for several years.

13. Each of the defendant airlines is subject to constant regulation by the Civil Aeronautics Board insofar as the routes they fly and the service they provide to the various towns and cities are concerned. While there is some element of discretion vested in defendants with respect to the number of flights they fly daily into plaintiff's airport, defendants constitute for all practical purposes a "captive audience." They are not free to pick and choose among the airports they will serve. There are no other airports in the Raleigh-Durham area at which defendants could land in the hope of providing services to the citizens of Wake and Durham Counties.

14. The defendants and their aircrafts are a substantial force in attracting to plaintiff's airport, many, if not most, of the citizens who come there. Were it not for the availability of the services rendered by defendants at Raleigh-Durham Airport, substantially less would be spent annually at the airport restaurant, parking lots, motel and car rental facilities. Plaintiff earned the following amounts from the concerns listed during the fiscal year shown:

| | 1972 | 1973 | 1974 | 1975 |
|---|---|---|---|---|
| Dobbs House Restaurant | 83,697 | 91,788 | 97,464 | 107,042 |
| Airport Parking Company | 284,620 | 349,106 | 397,353 | 486,885 |
| Hertz U-Drive-It | 81,220 | 99,452 | 124,657 | 135,647 |
| Avis Rent-A-Car | 84,605 | 104,091 | 120,027 | 131,504 |
| National Car Rental | 57,715 | 69,440 | 71,349 | 77,489 |
| Triangle Motel | 16,619 | 15,780 | 16,646 | 17,961 |

In addition, however, plaintiff renders many services to defendants and to general aviation and were it not for the facilities offered by plaintiff, defendants' business and revenues in the area would be substantially hampered and impaired.

15. In recent years, substantial increases in both traffic volume and the size of commercial airplanes landing at the Raleigh-Durham Airport have created the necessity for expansion of existing facilities at the airport. After considerable discussion and some difficulty which need not be recounted here, plaintiff has developed a new schematic physical airport expansion plan which it believes will be both practically and environmentally acceptable. This plan is now designated as Plan B. Plan B in its simplest terms calls for the eventual construction of a new 10,000 foot runway parallel to

the existing 14/32 runway, the reconstruction of the 7500 foot 5/23 runway, the extension of the existing 14/32 runway to 6500 foot and the construction of a new terminal building. Before Plan B can be implemented, however, it must be administratively approved by at least two federal organizations. First, an Environmental Impact Statement must be prepared by the FAA for submission to the Department of Transportation, which then either approves or disapproves the proposed plan from an environmental impact viewpoint. At this time, it appears that the FAA has not released even a draft of its Environmental Impact Statement, and there is of course no assurance that the Department of Transportation will approve Plan B when the FAA statement is finally submitted to it. In addition, it appears that should Plan B be approved, a minimum of two years will elapse before construction can be completed. While there is some dispute concerning the earliest possible completion date for the new parallel runway, it appears certain that even immediate approval of Plan B would not allow completion before late 1979. In the event Plan B is rejected by the Department of Transportation, plaintiff would have to "go back to the drawing board" to develop a new plan.

16. In addition to the major expansion proposed under Plan B, plaintiff is now faced with the necessity of overlaying the pavement of main runway 5/23 and the air carrier apron and associated taxiways. These areas were overlaid in 1966 and at that time the useful life of the improvement was estimated to be ten years. The estimates were accurate and major strengthening and overlayment of these facilities is now necessary and presently scheduled for September, 1976, during which time it will be necessary to close the airport to commercial jet aircraft for an estimated 10-day period. This construction, however, had not commenced during the period of time for which the amount of landing fees is contested in this action. When completed, the cost of the repairs and improvements are estimated to be $1,700,-000.00 for the runway 5/23 overlay and

$1,500,000.00 for the overlayment of the air carrier apron and associated taxiways.

17. The landing fees at issue in this case are based on a stated charge per 1000 pounds of maximum allowable landing weight for defendants' aircraft. For the three most recent fiscal years now completed, the maximum allowable gross landing weights are listed below. For the first year, the period from October 1, 1973 (the date upon which plaintiff's increased landing fee was scheduled to take effect) to March 31, 1974 was projected to 12 months by the addition of five months an average for that period. In addition, it does not appear that there has been any significant increase or decrease in the weight total from March 31, 1976 until the present, and for purposes of this lawsuit, the court will consider the weight for that period to have been comparable to those indicated for the preceding years.

| Year ended | Gross weight landed |
|---|---|
| 3/31/74 | 1,466,448,000 |
| 3/31/75 | 1,673,429,000 |
| 3/31/76 | 1,670,991,000 |
| | 4,815,868,000 |

18. Plaintiff's method of calculating a reasonable landing fee to which it feels it is entitled involves first calculating the total average annual cost of operating and maintaining the airfield facilities at the Raleigh-Durham Airport. The portion of this cost which plaintiff attributes to commercial aviation is then divided by the landing weight indicated above to obtain an approximate figure for what plaintiff considers a reasonable landing fee. The landing weight totals are not disputed, nor is the method of calculation the principal issue in this case. Rather, it is plaintiff's method of calculating and attributing total average annual cost of operation and maintenance which is chiefly at issue.

Plaintiff's theory of operation and cost allocation is what is generally termed a cost of services system. Described in simple terms, such a system can be said to require each of the operating areas of the airport to "pay its own way." The principal operating areas of the Raleigh-Durham Airport, or any other airport, are the "landside"

operations (terminal, concessions, etc.) and the "airside" or aviation operations. Since it has only two principal operating areas, plaintiff's cost of services system can be described as a "two cash register" system, which requires landside and airside operations to support themselves independently of the profits or losses of the other. Perhaps the most vigorously contested issue in this case has been whether plaintiff can adhere to such a system, or whether, as defendants argue, the airport should operate under a one cash register system in which credit for landslide profits (which are substantial in this case) should be attributed to airside operations, thus reducing defendants' obligation for landing fees. A secondary but related issue is whether the commercial airline defendants are also entitled to a similar credit for the profits from general aviation operations on the airside. Under the present system of two cash registers or cost of services, plaintiff calculates that general aviation is responsible for a percentage of the average annual cost of operating and maintaining airside facilities equal to the percentage of total annual landing weight attributable to general aviation, i. e., 27.6%. For the period in question, general aviation revenues have exceeded this percentage of total airside costs, with the result being commercial aviation responsibility for 72.4% of the annual cost despite general aviation profits.

During the final oral arguments in this case, counsel for defendants indicated some willingness on their part to operate and calculate landing fees under a two cash register system, *if* it were fairly and regularly applied in all cases. They did not, of course, wholeheartedly endorse it in lieu of the one cash register system. On this issue, the court finds merit in both positions and finds as a fact that a two cash register system, as generally proposed by plaintiff, is a reasonable method of allocating costs and calculating airport landing fees, if it is fairly and regularly applied in all cases. This is not to say that such a method is the only reasonable procedure for airport accounting and calculation of landing fees. Rather, it is useful and reasonable tool whose proper application can produce a useful and reasonable result.

19. In order to justify its 34 cent per 1000 pounds landing fee, plaintiff has presented its calculation, based on a two cash register system, of the total average annual cost of operating and maintaining the airfield facilities. According to plaintiff, the calculation is for the five year period from October 1, 1973 until the same date in 1978, and it is stated as follows:

| | |
|---|---|
| Administration, operation and maintenance | 250,000 |
| Depreciation of airfield improvements | 160,000 |
| Interest on investment in land | 117,500 |
| Deferred maintenance reserve | 200,000 |
| Bond debt service | 128,000 |
| Total Aug. Annual Cost | 855,000 |

The 72.4% of the average annual cost for which commercial aviation is responsible under the two cash register or cost of services system amounts to $619,382.00 annually. Plaintiff's proposed landing fee of 34 cents per thousand pounds actually would have been insufficient in the years ended March 31, 1974, 1975, and 1976 to yield a total of $619,382.00. In fact, a landing fee of 38.6 cents per thousand pounds would have been necessary during that three year period to defray the total cost as calculated above. Plaintiff's 34 cent fee is thus well within the range of its own calculations; the point of contention between the parties is whether plaintiff's calculations of average annual cost is reasonable and correct, and each element of plaintiff's cost calculation therefor is discussed in detail below.

20. A cost allocation analysis prepared by Ernst & Ernst, Certified Public Accountants based upon a study for fiscal year ending March 31, 1975 showed actual expense of the administration operation and maintenance of the airfield facilities at Raleigh-Durham Airport to be $235,701.00. To this plaintiff would add cost for snow removal or payments made for maintenance and repairs as a result thereof are $14,300.00, making a total cost of $250,000. The defendant had no quarrel with the figures of Ernst & Ernst, but dissatisfied with the $14,300.00, but would accept $235,000 figure. Defendants, however, would deduct

from the $235,000 figure the $168,000 in revenue which was received from General Aviation which was for gas, oil, parking, fixed base operations, etc. The deduction of the $168,000, however, is not justified or required under the two cash register system described and approved above. Defendants' objection to the addition for snow removal and related expenses is based upon the fact that lesser amounts were required during immediately preceding years. This addition, however, is not an unreasonable one based upon historical cost for such procedures, and the $250,000 figure thus is proper.

21. There was no contest over the figure $160,000 as the average annual depreciation of air field improvements, plus average annual interest on undepreciated investment for the period October 1, 1973 to September 30, 1978. For the purpose of such depreciation paving and lights were found to have a useful life of 10 years; drainage and other work useful life of 20 years. In addition, interest was computed annually on the undepreciated balance for the investment in air field improvements.

22. The total average acreage owned and managed by plaintiff as of October 1, 1973 was 3,661 acres, the original cost of which was $2,858,457.00. An estimated 700 acres are devoted to non-air field usage (road building, parking lots, future terminal area, etc.) leaving a total of 2,961 acres devoted to air field use. Deducting the 700 acres not used for air field purposes at the average per acre cost ($2,858,457 divided by 3,661) gives a total original cost of the air field land in the amount of $2,306,248.00. For the purpose of testing the reasonableness of plaintiff's $.34 per 1,000 pound landing fee, the total investment land has to be further reduced by the original costs of an additional 825 acres purchased by the United States during World War II for an estimated $350 per acre; $288,750.00; and the full amount of Federal Participation in Land Purchases since World War II; $58,-

840.00, a total of further reductions of $347,590.00 which reduces the balance to $1,958,658.00 and represents local investments only. Application of an interest rate of 6%[4] to the sum of $1,958,658.00 results in an annual return of $117,520.00.

Defendants have contested the inclusion of the entire amount of acreage remaining after the adjustments above for calculation of the rate to be charged for landing fees. They insist that any consideration of Plan B, which calls for a new runway, would cause defendants to pay for land not actually in use for take-off, landing, and other airfield purposes at this time.

■ It is uncontested that the interest on the land to be used for this runway and the implementation of Plan B would amount to $57,500. The court finds as a fact that it would be unreasonable to include in the rate structure for landing fees this interest, as the property is not now in use. If and when the property is in use, appropriate adjustments may be made.

23. Plaintiff has also included in its calculation an item designed Periodic Maintenance Reserve in the amount of $200,000. Defendant objects to the inclusion of this amount in the average annual cost of operation and maintenance. The manner in which plaintiff arrived at this $200,000 figure can be described as follows. The cost of repairs and improvements to runway 5/23, now scheduled for September, 1976 are projected to be $1,700,000, and the useful life of the improvements is calculated to be 10 years. Two years of the 10-year useful life span comes within the 5-year period which plaintiff selected for analysis (1973–78) and the amortized cost for the two years averaged over the five year period is $68,000 (i. e., $1,700,000 divided by 10 equals $170,000 times two equals $340,000 divided by five equals $68,000). The reconstruction of overlay of air carrier apron and taxiways, also scheduled for September, 1976, is projected to cost $1,500,000. Similarly analyzed, an average amount of $60,000 is at-

---

**4.** Initially there was some argument about 5% or 6% but defendants acknowledged during the trial that the rate of 6% was not unreasonable.

tributed to each year of plaintiff's proposed five year analysis.

Interest at the rate of 6% per annum on the undepreciated balance of the cost of these projects, similarly averaged, yields an average interest cost of $37,940 applicable to runway 5/23 repairs and $34,200 applicable to apron and taxiway repairs. Therefore, for the 1973–78 period annual periodic maintenance costs and interest would total $200,000 by plaintiff's calculation. [$68,000 plus $60,000 plus $37,940 plus $34,200 equals $200,140.] Defendants object to the inclusion of these amounts for calculation of an appropriate landing fee for those years prior to the time when the repairs and improvements were completed and placed in service. These repairs are not scheduled to begin until September, 1976, and there is no possible factual justification for including depreciation and interest on these improvements in what is purported to be the *cost* of operating and maintaining the airfield for any year prior to the one in which these repairs and improvements were begun and/or completed. The period at issue in this case is, of course, October 1, 1973 until the present, a time during which the repairs and improvements were neither being constructed nor in service. The concept of defendants prepaying or prefunding such improvements by increased landing fees prior to their construction might be desirable from plaintiff's standpoint, but defendants object to it strongly and, for reasons indicated in the conclusions of law, this concept has no proper place in calculation of landing fees absent negotiation and the consent of the airlines against whom the fees are assessed.

For reasons known only to itself, plaintiff included no amount for periodic maintenance reserve other than the aforementioned $200,000. Defendants indicated at the final oral arguments that they had no strong objection to the inclusion of an amount of $25,000 for this purpose. Such an amount would be consistent with the previously mentioned analysis of Ernst & Ernst, with what the parties indicate is a requirement in plaintiff's outstanding bond issue of a cash reserve account of $25,000, and with the nature and value of plaintiff's physical facilities. Therefore, although the $200,000 amount included by plaintiff in its average annual cost figure appears unreasonable, the inclusion of a $25,000 amount for periodic maintenance reserve appears proper.

24. Defendants have also objected to the inclusion of $128,000 for landing area revenue bond debt service. Their initial objection was that a double charge was involved in the payment of interest on investment in land, discussed previously, and the additional payment of interest on bonds whose proceeds were used to purchase the same land. This objection concerned the land purchased for Plan B expansion, which plaintiff originally included in its calculation of return on land investment. Since the court has previously found that Plan B land is not to be included in that category, however, defendants' objection to the double charge is no longer an issue.

It does appear, however, that the interest charges included in plaintiff's calculation are for the $3,000,000 bond issue of 1972 (discussed above in Finding of Fact No. 11), which was intended and used to finance the purchase of land required for airport expansion under the proposed Plan B. The inclusion of Plan B land as an element in calculating average annual expense has been previously discussed in Finding of Fact No. 22, and it appears that the figure proposed here for interest on bonds used to finance acquisition of Plan B land would be improper for the same reasons set forth above. At the present time, when plaintiff's proposed Plan B has not been given the required administrative and environmental approval and immediate construction is not a reasonable foreseeable possibility, there is no justification for including this bond interest in calculating landing fee rates for the period beginning October 31, 1973.

25. The effect of the previous findings is to reduce the amount of average annual airfield costs allocated to commercial air carriers ($619,382.00) by the commercial air carriers' pro rata share (72.4%) of the fol-

lowing figures: $57,500 return on investment in Plan B land, $128,000 bond debt service, and $175,000 periodic maintenance reserve. The allowable average annual cost for the period beginning April 1, 1973 and ending March 31, 1976 thus can be calculated as $358,380. Total cost for the three year period therefore is $1,075,140. This total cost for the three year period, when divided by the total landing weight for the same period of 4,815,868,000 pounds indicates that a landing fee of 22.3 cents per 1000 pounds maximum allowable landing weight would be necessary to meet the realistic costs for this three year period. As has been previously indicated, it appears that the period from March 31, 1976 to the present has been substantially similar to the preceding years in the matter of landing weights and airfield costs. Therefore, the figure calculated for the three year period discussed above also appears to be a proper figure for the period of time for which landing fees are in dispute in this case, i. e. October 1, 1973 to the present.

26. Although neither party has conceded to the other on the issue of rental charges for terminal space, both parties appear to be primarily concerned with resolving the controversy over landing fees. Little evidence was presented at trial on this issue, and counsel did not devote a significant amount of time or space to arguing this point either in their briefs or during oral argument. From the evidence presented, however, the court is compelled to find as a fact that an overall rate of $6.00 per square foot has not been shown to be an unreasonable charge for the indoor and outdoor terminal space rented by plaintiff to the defendant airlines.

## CONCLUSIONS OF LAW

A. The authority of this court in this case is limited to a determination of whether plaintiff, in establishing the fee it will charge for the privilege of landing an air-craft upon its runway and the rent it will charge for the use of the property, is within the statutory authority granted plaintiff by North Carolina General Statute Section 63–53(5) (1945), granting specific powers to municipalities operating airports, as follows.

In addition to the general powers in this Article conferred, and without limitation thereof, a municipality which has established or may hereafter establish airports, restricted landing areas or other navigation facilities, or which has acquired or set apart or may hereafter acquire or set apart real property for such purpose or purposes is hereby authorized:

(5) To determine the charge or rental for the use of any properties under its control and the charges for any services or accommodations and the terms and conditions under which such properties may be used, provided that in all cases the public is not deprived of its rightful, equal, and uniform use of such property. *Charges shall be reasonable* and uniform for the same class of service *and established with due regard to the property and improvements used* and the *expense of operation* to the *municipality.* . . . (Emphasis added.)

B. There are no constitutional infirmities in the fixing of landing fees and space use charges so long as the plaintiff complies with the provisions of the statute.[5] No provision of the statute requires "that the Authority conduct a hearing, receive evidence and make findings of fact or that it follow any other procedural course in determining the landing fees or rentals to be charged by it"—and—"nothing in these statutes requires the Authority to give notice to present or prospective users of its properties that the Authority is contemplating a change in such fees and rental charges."[6]

C. This court takes judicial notice of the practice in effect nationwide (there are

---

5. Counsel for defendants raised the issue of vagueness under the North Carolina Constitution, or lack of "guidelines", but withdrew such issue at the final hearing in Raleigh.

6. *Piedmont Aviation, Inc. v. Raleigh-Durham Airport Authority*, 288 N.C. 98, 100, 215 S.E.2d 552 (1975).

some, but very fee exceptions) of establishing the rates to be charged for airport landing fees and space rental by the process of negotiation. As indicated in the opinion of the North Carolina Supreme Court, unilateral fixing of fees is nowhere prohibited in the North Carolina statute, and no set procedure is required or commanded. Negotiations were, however, used in arriving at fees and charges in effect prior to the charges here in issue.

D. This is not a judicial review of an administrative decision, but a test of the exercise of the proprietary function of the Authority to fix fees and rental charges. The question is whether the proposed landing fees and rental charges are unreasonable and discriminatory and in excess of the limitation imposed by General Statute 63–53(5).

■ E. This court takes judicial notice of the interdependence of the parties. The authority is directly dependent on the inflow and outflow of commercial passengers and freight, as served by the airlines, to provide the people—traffic who use a majority of such services as restaurant, parking space, ticket counter, concessions, etc. Conversely, the airlines are directly dependent on the authority for the furnishing/maintenance of the landing and parking (plane) areas and supporting facilities. Each has a duty to supply and serve those members of the traveling public travelling by scheduled airlines to and from the geographical area served by the Authority, together with adjacent and contiguous territories. It is inconceivable that one could operate without the other.

■ F. Defendants have raised but not strenuously argued the question of whether or not plaintiff's exercise of its state statutory authority in setting landing fees is invalid as an unreasonable burden on interstate commerce in violation of Article I, § 8, of the United States Constitution. Unfortunately, the criteria for determining whether a local charge is an unreasonable burden upon interstate commerce can no more be established with total precision than can the criteria for determining whether a landing fee is reasonable under NCGS 63–53(5). The court is satisfied, however, that a fee reasonable under the North Carolina Statute will also meet the test of reasonableness under the commerce clause. *See Evansville-Vanderburgh Airport Authority v. Delta Air Lines,* 405 U.S. 707, 92 S.Ct. 1349, 31 L.Ed.2d 620 (1972).

■ G. The parties have devoted some effort to discussions of where the burden of proof rests in this action. Plaintiff contends that its action in setting landing fees must be presumed lawful and regular since it is tantamount to the exercise by municipality of authorities specifically delegated to it by the State legislature. Under plaintiff's theory, the presumption of regularity would extend to encompass a presumption of reasonableness of the landing fees established by the authority and thus effectively place the burden of proof of unreasonableness on defendants by something akin to the standard of clear, cogent and convincing evidence. From the evidence presented, however, it is the conclusion of the court that the 34 cents landing fee proposed by plaintiff is not a charge which is "reasonable . . . and established with due regard to the property and improvements used and the expense of operation to the municipality," and that this conclusion is clearly required by evidence which so exceeds a preponderance as to be sufficient to establish defendants' case under even the heaviest burden of proof which plaintiff has suggested should be placed upon the defendants.

As counsel for the parties agreed in discussing the case, where an airport and its landing fees are involved, "the very nature of the beast" is such that precise calculations and fixed procedures for fee setting are virtual impossibilities. Nevertheless, while the standard of reasonableness under NCGS 63–53(5) may be an imprecise one, it is by no means infected with impermissible vagueness. As is indicated by the many cases involving rate setting for public utilities, many of which have been cited by both of the parties, a rate-governing statute may often provide only the skeletal framework

upon which rate setting procedures must be fleshed out through negotiation, hearings, or legal challenges.

■ In this case, plaintiff purported to establish a landing fee level effective for a five year period, and the initial task of the court is to determine the reasonableness of the specific fee established by the plaintiff. Of course, the nature of airports and their relationship with air carriers is such that landing fees conceivably could vary substantially over any given five year period. An attempt to set fees effective for five years, however, is not in itself an unreasonable procedure and, on the contrary, should be commended for its tendency to promote financial certainty and sound fiscal planning. But since the parties have not been able to set such a fee through the ordinary processes of negotiation, the court, in deciding this lawsuit, must shape its decision on the basis of whether the 34 cents landing fee which plaintiff purported to make effective October 1, 1973 was then and is now a reasonable fee. Under the circumstances, the court is compelled to conclude that 34 cents per 1000 pounds was not a reasonable landing fee for the period of time involved in this lawsuit. This conclusion is based not upon any defect in the basic process by which plaintiff accounted for and calculated its cost and expenses and thereafter determined landing fees, but rather upon the inclusion of certain impermissible items in the total annual airfield costs which plaintiff seeks to recover from defendants through their payment of landing fees. The items identified and discussed in the foregoing findings of fact and subsequently eliminated by the calculation contained in Finding of Fact No. 25 failed to reflect the true average annual cost of operating the airfield facilities at the Raleigh-Durham Airport for the period commencing October 1, 1973. Their inclusion therefore constitutes a fatal flaw in plaintiff's attempt to calculate and establish for that period a landing fee which is reasonable under the provisions of NCGS 63–53(5).

H. The fact that the landing fee established by plaintiff is found to be unreasonable certainly does not mean that the authority is not entitled to any recovery of landing fees from defendants for the period in question. This court, however, will not attempt to roll back the clock and place itself in the position of the Raleigh-Durham Airport Authority by saying that the landing fee effective October 1, 1973 should have been and therefore was a fee of any particular amount. The court is unable to usurp the statutory function of the Airport Authority in this regard any more than it is able to do so by ruling that a landing fee of a particular amount will be in effect at the Raleigh-Durham Airport from this time until some point in the future.

■ It is therefore fortunate that the North Carolina Legislature wisely has enacted a statute which provides both authority and guidance for this court in determining the recovery to which plaintiff is entitled in this case. North Carolina General Statute Section 42–4 provides:

> When any person occupies land of another by permission of such other, without any express agreement for rent . . . the landlord may recover a reasonable compensation for such occupation. . .

The North Carolina courts appear not to have construed this statute in any reported decision, but this court is satisfied that the air lines' use of the airport can be termed an "occupation" of land within the meaning of this statute and that plaintiff is entitled to reasonable compensation therefor. It is likely that a similar result could be obtained through application of the common law doctrine of quantum meruit, but where the legislature has elected to codify common law principles, it seems the duty of the courts to apply the statutes thus provided.

■ I. It does not appear necessary for the court to become involved in the semantic complexities involved in any determination of whether one legislative definition of reasonableness is synonymous with another. Rather, this court can safely conclude that a calculation properly carried out under the general method proposed by plaintiff and discussed above (that method being a rea-

sonable one) can produce a figure for landing fees which is simultaneously reasonable under Section 63–53(5), reasonable in light of the commerce clause, and both reasonable and correct for the plaintiff-landlord to recover under the provisions of NCGS § 42–4. Such a calculation is that described in detail in Finding of Fact No. 25, and it produces a figure of 22.3 cents per 1000 pounds landing weight as the fee to be applied in calculating the recovery to which plaintiff is entitled in this case.

The process by which this figure is derived incorporates plaintiff's two cash register theory to the extent that it apportions the amounts owed by commercial and general aviation according to the total landed weight for each and to the extent that it gives no credit to commercial aviation for the excess of general aviation's revenue over its apportioned share. Of course, this figure also represents a two cash register theory in that it gives no credit at all to airside operations for the substantial profits derived from landside operations. Proper application of this concept in all respects, however, should not result in any prejudice to the airlines. For example, the absence of credit for landside profits will not prejudice the defendants if (1) financial reserves accumulated with landside profits are used in the future only to fund landside expansion and the airlines, consistent with the two cash register system, are not expected to contribute either now or in the future to finance any landside expansion; or (2) if, in the alternative, reserves accumulated from landside profits are used to assist in funding airside expansion, the total of such funds applied to the airside expansion is subtracted from the total airside expansion costs for which the airlines are considered responsible and obligated to offset through their payment of landing fees. In addition, total adherence to the two cash register for a cost of services concept would require similar treatment for any reserves accumulated from general aviation profits and later used to finance overall airside expansion. The obvious effect of failure to extend such credit would be to compel the airlines to pay for something which had already been paid for by profits from other sources. This treatment of course appears inconsistent with the overall two cash register concept because it is indeed a partial reversion to the one cash register system. The election, however, lies with the Airport Authority. Plaintiff simply cannot have it both ways by demanding that defendants pay landing fees calculated on a cost of services theory and simultaneously funding airside facilities with the substantial profits derived from landside operations. In short, only the fair and consistent application of plaintiff's method of calculation and of the two cash register system can now produce or could have produced as of October 1, 1973 a landing fee which is reasonable under NCGS 63–53(5) and the commerce clause and also representative of the reasonable compensation to which plaintiff is entitled as its recovery in this lawsuit.

J. As the Findings of Fact above reflect, there was insufficient evidence presented to this court to support a conclusion of unreasonableness concerning the $6.00 per square foot rental charge for indoor and outdoor terminal space rented by plaintiff to the defendants. The court therefore must conclude that such a charge was a reasonable one and that plaintiff is entitled to recovery in this lawsuit on the basis of that amount.

K. The court also concludes that it is without the authority to establish a landing fee which shall be in effect at the Raleigh-Durham Airport at any time following the termination of this litigation. As has long been the feeling of the court, that task is the sole responsibility of the Airport Authority under the statutory delegation of power to it by the North Carolina legislature. While the authorizing statute does not specifically command that landing fees be established through the process of negotiation, it is clear that negotiation is the only reasonable and effective means of establishing a landing fee which both the airport and the airlines can live with. The requirement of some flexibility in landing fees must be considered implicit in the concept of reasonableness which forms the

foundation of NCGS 63–53(5). Only through thoughtful and rational negotiation of landing fees can this valuable advantage of flexibility achieve its full potential. It is therefore the sincere hope of this court that there has now come an end to the total breakdown in communications between the parties which necessitated this lawsuit, for the court is now convinced, and the parties undoubtedly must be convinced also, that only through reasoned negotiation can the system of establishing landing fees be accomplished in the fair and orderly manner which was intended by the legislature of the State of North Carolina.

### ORDER

The Clerk of this court shall enter judgment for plaintiff against each defendant for a sum to be arrived at by multiplying the total gross weight landed for such defendant for the period October 1, 1973 to October 1, 1976 by 22.3 cents per 1000 pounds, less the amounts paid as landing fees by the respective airlines during the period. The plaintiff will assist the Office of Clerk in preparing judgment for this court's signature.

The judgment shall bear interest on the sum which would have been, but has not been paid, for the period October 1, 1973 to October 1, 1974 at six (6%) per cent per annum from October 1, 1974; likewise on the amount due for the period October 1, 1974 to October 1, 1975, at six (6%) per cent from October 1, 1975 and on the amount due for the period from October 1, 1975 to October 1, 1976 at six (6%) per cent per annum on the amount due October 1, 1976.

This court makes no finding, and draws no conclusion on the landing fees to be charged after October 1, 1976. The Authority is charged with the power and responsibility of establishing fees in the future on a reasonable basis, preferably by negotiation, taking into consideration such factors as this order reflects; but not bound to a fixed formula because of the changing nature and use of the various properties involved, and the needs of both airport and airlines, to the end that the general public be best served thereby. Having observed the dedication and diligence of the members of the Airport Authority and airline representatives in the court, this court indulges in the confident hope agreement can be reached and further litigation avoided.

If counsel cannot agree on taxation of costs, proper motion should present the issue to this court.

AND IT IS SO ORDERED.

### ORDER ON PLAINTIFF'S MOTION TO AMEND THE MEMORANDUM OPINION OF SEPTEMBER 7, 1976 (Signing Date).

Plaintiff's Motion to Amend the court's Memorandum Opinion was heard, at Columbia, S. C., October 6, 1976. Colloquies between court and able counsel for the parties spotlighted difficulties that must be faced in the future [1] in arriving at landing fees to be charged user airlines at the Raleigh-Durham Airport.

Plaintiff's counsel first complained that paragraph I of the Conclusions of Law (pp. 33–35) proscribed/prescribed the elements to be taken into account in fixing landing fees in the future. Such is not the impact or the intent of the Memorandum Opinion. The parties agreed, at the final pretrial, as to the inclusion/exclusion of certain items in landing fee calculations. The court adopted the stipulation and the calculations used were based on those agreements, in the main. Plaintiff's contention as to this is without merit. Perhaps the opinion could be used as advisory; not binding after October 1, 1974 as the court was not asked to fix landing fees for the future.

Secondly, plaintiff contends the conclusions in subparagraph I subsidize the carriers. Such is not the case. Under the "two cash register system" now in effect, the plaintiff realizes handsome profits, and commendably so, from the "landside" operations, such as the parking lot, restaurant

1. Counsel advised that the figure arrived at by the court in its Memorandum Opinion would be in effect until the end of the current fiscal year at Raleigh-Durham Airport.

and other facilities used by passengers and public. Plaintiff does not wish this profit to be used to subsidize the "airside" operations which are generally described as the take-off, landing, runway, ramp, and airline maintenance areas. The opinion does not alter the use of the "two cash register" system, one for landside and one for airside. Of course, if the landslide shows a loss, it would be unjust to use landing fees to subsidize "landside" operations. This, of course, is advisory as this court has no authority, under present posture of the case to dictate to either party as to the inclusions in future negotiations.

The third complaint was found to be moot as the fees fixed by the court in the opinion are now acceptable.

A fourth complaint indicates a fear that the opinion will hamper future financing. After hearing arguments it appears both parties agree that the bonds to be issued by RDU authority in the future would have to be general revenue bonds, that the revenues would not be limited, and all revenues would be available. The difficulty stems from a fear that, on the one hand, the plaintiff would spend money for something the airlines believed to be without benefit to the airside and that the cost would be reflected in the landing fees; on the other hand, the plaintiff fears it will be restricted in issuing bonds, and that, if moneys from the *profits* of the landside are used for financing, the airlines will not want to pay fees to reflect moneys spent on the airside. These fears do not restrict the financing and this court's order in no way restricts the authority of plaintiff to issue bonds under such authority as North Carolina has given. North Carolina statutes control; and this court's opinion preempts North Carolina statutes in no way.

During the hearing the parties discussed problems which exist in attempting to negotiate the landing fees to be charged in the future. It appears that when the parties negotiate and reach an impasse no avenue for relief, except the courts, presently exists. This court has no authority to set any fees for the future, nor to impose guidelines for future negotiations. Were this court given the power it would order the parties to enter a contract agreeing on those matters of mutual accord and proposing a method of arbitration where disagreement is found. The resort to the courts is expensive, time consuming, and affords only temporary relief because the Authority, not the court, is given the statutory duty to manage the airport (including negotiation fees) in this public-oriented landlord-tenant relationship. The court is, of course, open to all to use under appropriate circumstances.

The opinion of September 7 is amended to include the provisions herein published, including obvious dicta.

AND IT IS SO ORDERED.