**INDIANAPOLIS AIRPORT AUTHORITY, Plaintiff-Appellant,**

v.

**AMERICAN AIRLINES, INC., et al., Defendants-Appellees.**

**No. 82–2774.**

United States Court of Appeals, Seventh Circuit.

Argued Nov. 29, 1983.

Decided May 10, 1984.

William P. Wooden, Wooden, McLaughlin & Sterner, Indianapolis, Ind., for plaintiff-appellant.

Malcolm C. Mallette, Krieg, DeVault, Alexander & Capehart, Indianapolis, Ind., for defendant-appellee.

Before POSNER, COFFEY and FLAUM, Circuit Judges.

POSNER, Circuit Judge.

The Indianapolis Airport Authority appeals from a decision invalidating the user fees that it imposes on airlines; the appellees are six airlines that among them carry more than 90 percent of the passengers who use the Indianapolis International Airport. The 15-year leases under which each of the airlines operated expired on August 31, 1980, and because the parties had been unable to agree on terms for new leases, the airport authority—a local governmental body established pursuant to the Indiana Airport Authorities Act, Ind.Code §§ 8–22–3–1 *et seq.*—enacted an ordinance (later amended) setting new fees effective September 1, 1980. When the airlines refused to pay the new fees, which were almost double those in the expired leases, and continued paying at the old level, the Authority brought this diversity action to collect

the difference between the new fees and the old—some $2 million. In the district court the airlines successfully defended their refusal to comply with the ordinance on the ground that the fee schedule in the ordinance was unreasonable on a variety of statutory (state and federal) and constitutional grounds, and they also persuaded the court that they were holdover tenants entitled under Indiana law to continue paying at the old lease rate until the Authority stopped accepting payments at that rate.

The main issue is whether the airport authority, in setting a new schedule of fees for the airlines, could disregard the revenues it obtains from airport concessionaires, in particular several car rental agencies and the operator of the airport's parking lot. The ordinance allocates the annual costs of operating the airport among the different classes of user—mainly interstate airlines, operators of private planes ("general aviation"), and concessionaires—largely on the basis of how much runway, hangar, terminal, and other indoor and outdoor airport space each class uses. (For services such as firefighting that have no fixed locale—obviously, the firemen and their equipment go wherever the fire is—a different method of allocation is used that we discuss later.) Since the concessionaires use much less space than the airlines, only a modest fraction of the airport's costs was allocated to them—in round numbers, $100,000 to the car rental agencies and $900,000 to the operator of the parking lot—compared to $3 million to the airlines. The ordinance requires the airlines to pay landing fees and other charges calculated to yield the full $3 million, even though the airport gets from its concessionaires a rental income that greatly exceeds the costs allocated to the concessionaires—about $3.5 million from the car rental agencies and the parking lot alone, compared to costs as we have said of about $1 million. The ordinance thus is calculated to yield the airport a total income substantially greater than its total costs, the excess being approximated by the difference between the airport costs allocated to the concessionaires and the airport rentals they pay.

The reasonableness of the concession rentals themselves is not in issue in this case—only the reasonableness of the fees charged the airlines. The basis of the airlines' complaint about those fees, however, is that the airport is required to and has failed to take its concession rentals into account in determining what fees to impose on the airlines.

■ The Indiana Airport Authorities Act authorizes airport authorities, such as the appellant, "To adopt a schedule of reasonable charges and to collect them from all users of facilities and services within the [airport] district." Ind.Code § 8–22–3–11(9). However, reasonableness is not defined in the statute, and the statute has not been interpreted by the Indiana courts with reference to the issues in this case. The Federal Anti-Head-Tax Act forbids any state agency to "levy or collect a tax, fee, head charge, or other charge, directly or indirectly, on persons traveling in air commerce or on the carriage of persons traveling in air commerce ...," 49 U.S.C. § 1513(a), other than "reasonable rental charges, landing fees, and other service charges from aircraft operators for the use of airport facilities," 49 U.S.C. § 1513(b). Again, reasonableness is not defined, but the statute has a history and a context that enable us to give meaning to the term. Airport authorities, to raise revenues, had taken to imposing "head taxes" on passengers emplaning at their airports. Congress decided that "the head tax is an unnecessary burden on interstate commerce, that it is discriminatory, and that it has a stifling effect on air transportation," most of which, of course, is interstate. H.R.Rep. No. 157, 93d Cong., 1st Sess. 4 (1973). We may assume that what is unreasonable under the federal act is also unreasonable under the state act; but, in any event, if there is a clash, the federal act must of course prevail. Another federal act is invoked, the Airport and Airway Development Act of 1970, 49 U.S.C. § 1718(a)(1) (1976 ed.), now 49 U.S.C. § 2210(a)(1),

which requires that airports receiving federal subsidies—such as the Indianapolis airport—be "available for public use on fair and reasonable terms and without unjust discrimination . . . ." It is unclear whether this act was intended to be enforceable by airport users, such as the appellee airlines; but it will not be necessary in this case to resolve this question, or determine whether the challenged user fees are unreasonable under this act.

■ Besides the Federal Anti-Head-Tax Act and important to understanding it, the appellees invoke the commerce clause of the Constitution (Art. I, § 8, cl. 3), which has been interpreted to forbid the states to discriminate against interstate commerce. See, e.g., *Southern Pac. Co. v. Arizona,* 325 U.S. 761, 767–68, 65 S.Ct. 1515, 1519, 89 L.Ed. 1915 (1945), and for this circuit's most recent application of the clause *W.C.M. Window Co. v. Bernardi,* 730 F.2d 486, 493–96 (7th Cir.1984). Although the clause as written is a grant of authority to Congress to regulate interstate (and foreign) commerce rather than an independent limitation on state power, the Supreme Court, building on a dictum by John Marshall in *Gibbons v. Ogden,* 22 U.S. (9 Wheat.), 1, 197–209, 6 L.Ed. 23 (1824), early on interpreted the clause as prohibiting of its own force, without need for congressional action, state action that discriminates against interstate commerce. See, e.g., *Cooley v. Board of Wardens,* 53 U.S. (12 How.) 299, 319, 13 L.Ed. 996 (1851). Although controversial, see, e.g., Kitch, *Regulation and the American Common Market,* in Regulation, Federalism, and Interstate Commerce 7, 20–22 (Tarlock ed. 1981), this interpretation of the commerce clause can be defended on the practical ground that Congress is too busy—and maybe as James Madison feared too factionalized—to police every infringement of the policy (implied by a number of separate provisions of the Constitution) that the United States be a single "common market" for goods and services. See Eule, *Laying the Dormant Commerce Clause to Rest,* 91 Yale L.J. 425, 431–32 (1982). But this ground fails when Congress has exercised its regulatory power. "Once Congress acts, courts are not free to review state taxes or other regulations under the dormant Commerce Clause. When Congress has struck the balance it deems appropriate, the courts are no longer needed to prevent States from burdening commerce, and it matters not that the courts would invalidate the state tax or regulation under the Commerce Clause in the absence of congressional action." *Merrion v. Jicarilla Apache Tribe,* 455 U.S. 130, 154, 102 S.Ct. 894, 910, 71 L.Ed.2d 21 (1982). Congress has acted here, in the Anti-Head-Tax Act, by forbidding airport authorities to charge unreasonable rates, directly or indirectly, to interstate airlines. Therefore, when those rates are challenged, the only question is whether they are consistent with the congressional policy.

■ We are asked by an amicus curiae to consider the bearing of the Convention on International Civil Aviation ("the Chicago Convention," as it is known), 61 Stat. 1180. A treaty of the United States, see *British Caledonian Airways Ltd. v. Bond,* 665 F.2d 1153, 1159 n. 3 (D.C.Cir.1981), the Convention has the force of a federal statute. But it does not regulate airport fees. It establishes a Council with broad powers and the Council has recommended standards that require that landing fees and other airport charges be reasonable, but these standards are issued under a provision of the Convention, Article 55, relating to the "permissive" functions of the Council, and actions taken in discharge of those functions are not intended to have the force of law.

■ Two facts together persuade us that the district court was correct in concluding that the ordinance was unreasonable under the applicable state and federal standards in disregarding the airport's concession revenues. The first is monopoly. We take judicial notice of the fact that only six airports in Indiana are served by airlines other than commuter airlines and that Indianapolis International Airport is the only one in the central part of the state except

for Purdue University Airport in Lafayette. See U.S. Dept. of Transportation, Federal Aviation Administration, National Airport System Plan: Revised Statistics 1980–1989, at 141 (1980). The Purdue airport is tiny compared to the Indianapolis airport; the 22,940 passengers who emplaned there in 1982 were less than 2 percent of the 1,382,-391 who emplaned at Indianapolis that year. U.S. Dept. of Transportation, Federal Aviation Administration, U.S. Airport Emplanement Activity for CY 1982, at V(II–R)–29 (July 1, 1983). As no one in this lawsuit has advanced the improbable proposition that the Purdue airport is a feasible substitute for most or even many of the passengers who now use the Indianapolis airport, we may assume that except for travelers whose origination or destination is near the borders of the state (and who can therefore use the airports just across the state line, in Chicago, Louisville, and Cincinnati), most people traveling by air to and from Indiana have to use the Indianapolis airport.

Therefore, unless forbidden to do so by state or federal law, the Indianapolis Airport Authority can charge a monopoly price for the use of its airport—that is, a price in excess of the cost of operating the airport (including debt service). Of course the sky is not the limit. If the Authority charged too high a price many people would stop using the airport. For example, some of those traveling out of the state would fly out of small airports in the state and switch planes at the nearest major airport in a neighboring state; or they would drive, or take a bus or train, to their destination. But for most people these would be such grossly inferior alternatives to using the Indianapolis airport that they would rather pay even a hefty premium than switch. And it would make no economic difference whether this premium was charged to the passenger directly as he came into or left the airport or to the airline that carried him. If it was charged to the airline, the airline could turn around and raise its ticket prices to passengers to and from Indianapolis; if it was charged to the passenger the airline could absorb the charge by re-

ducing those prices. Whether airline or passenger ultimately bears the cost of an airport fee depends on the conditions of supply and demand rather than on who is assessed the charge. All this was recognized by the Congress that passed the Anti-Head-Tax Act. See S.Rep. No. 12, 93d Cong., 1st Sess. 22 (1973), U.S.Code Cong. & Admin.News 1973, p. 1434.

■ It should be clear without extended discussion that a monopoly price is an unreasonable price. Locational monopoly— the type of monopoly that the Indianapolis airport enjoys—is one of the traditional levers by which a state can (if not prevented) unreasonably burden interstate commerce, see Note, *Airline Deregulation and Airport Regulation,* 93 Yale L.J. 319, 322 (1983), and the Anti-Head-Tax Act was passed as we said earlier in order to prevent the placing of unreasonable burdens on interstate air transportation. The Senate Report refers to the "financial windfalls" that states or cities could obtain from imposing head taxes or equivalent taxes on the airlines or their passengers. See S.Rep. No. 12, *supra,* at 17. If the Indianapolis airport did not have monopoly power it could not extract revenues vastly in excess of its costs, which is what it has done by the combination of user fees and concession rentals shown on this record.

■ It is not enough for the airlines to show that the airport has monopoly power; it must also show that this power is being used to impose unreasonable rates, directly or indirectly, on the airlines or airline passengers, and not on other entities that are neither formal nor actual parties to this case. Here the second critical fact comes into play, which is that the people who use the concessions at the Indianapolis airport are, with rare exceptions, airline passengers. Although some airports adjacent to large cities (the Milwaukee airport for example) have meeting facilities that attract nonpassengers, the Indianapolis airport does not. The parking lot is used by emplaning passengers and by people picking up deplaning passengers. The car rental

agencies are used by emplaning and deplaning passengers, and likewise the food stands and newsstands. This means that when the airport charges a rental fee to concessionaires it is as if it were charging a landing fee to the airlines or imposing a head tax on the passengers. If a traveler is willing to pay $140 to fly from Indianapolis to (say) New York, it should be a matter of indifference to him whether he pays $100 for the ticket, $10 in head tax, and $30 for parking; or $120 for the ticket and $20 for parking, with no head tax. What matters to him is the total cost that he must incur to make the flight, rather than the form in which the cost is distributed among the various items that he must buy.

According to the Indianapolis Airport Authority's own figures, the annual cost to it of providing rental space and other services to the parking lot and the car rental agencies is only $1 million, yet it collects $3.5 million in annual rent from these concessions. The concessionaires recoup this expense in the prices they charge their customers—the airline passengers—and it is thus the passengers who end up paying the $2.5 million in net revenues that the Authority obtains from the concessionaires. When concession rentals—paid ultimately by the passengers or (in the form of reduced ticket prices) the airlines—that are more than three times the cost that the Authority itself allocates to the concessions are added to the airline user fees that also fall on either the airlines or their passengers, the result is an exaction that is wholly disproportionate to the costs to the airport of serving the airlines and their passengers, and is therefore unreasonable under the state and federal statutes. It is unreasonable whether done to evade the statutes, or to price discriminate against the more affluent passengers (heavy users of concession services), or for other reasons. And it is unreasonable even though we may assume that all of the Authority's income must be plowed back into airport development. See Ind.Code §§ 8–22–3–11, –25, –28, –29. No one can say how much of the overcharge extracted from the airlines'

passengers will return to them in this way. The Authority might decide to use most of it for the benefit of general-aviation users, or pour it into "gold-plating'" improvements that would give airline users a higher quality of airport services, at a higher price, than they wanted.

The problem of the Authority's disregarding its concession income in setting user fees has analogies in conventional public utility regulation. Many regulated firms have unregulated affiliates. A good example (at least before the recent changes in the structure and regulation of the telephone industry) is the manufacture of telephones—which has never been a regulated activity—by affiliates of regulated telephone companies. A telephone company might be tempted to evade rate regulation by having its manufacturing affiliate charge exorbitant prices (nominally to it) for telephones and by passing on the overcharge to the telephone ratepayers in the form of higher rates for telephone service. The ratepayers would end up paying monopoly prices, despite regulation. The regulatory agencies, however, were alert to the danger and successfully asserted the power to limit the profits of the manufacturing subsidiaries. See, e.g., *Illinois Bell Tel. Co. v. Illinois Commerce Comm'n*, 55 Ill.2d 443, 483–84, 303 N.E.2d 364, 376 (1973); 1 Kahn, The Economics of Regulation 28 n. 20 (1970); cf. *Smith v. Illinois Bell Tel. Co.*, 282 U.S. 133, 152–53, 51 S.Ct. 65, 70, 75 L.Ed. 235 (1930). No agency has regulatory authority over the rate practices of the Indianapolis Airport Authority; instead the duty of regulation falls to the courts in the enforcement of the state and federal statutes forbidding unreasonable rates. But this just means that we must imagine ourselves in the role of a regulatory agency (though with more circumscribed powers, because of the limitations that Article III places on federal judicial power, see, e.g., *Federal Radio Comm'n v. General Elec. Co.*, 281 U.S. 464, 469, 50 S.Ct. 389, 390, 74 L.Ed. 969 (1930)) that is charged with preventing airport authorities from setting exorbitant rates to airlines or

their passengers. By charging its concessionaires rent far in excess of the cost to the Authority of providing them with space and services (while charging the airlines landing fees equal to their full costs), knowing that the concessionaires will try to pass on their rental expenses to the passengers (their customers), the Authority is doing the same kind of thing that the telephone companies would have been doing if they had been allowed to charge their subscribers indirectly for exaggerated costs that the companies had allocated to manufacturing telephones. True, it is not exactly the same thing. The telephone subscriber *has* to have a telephone if he wants telephone service, and in the heyday of telephone regulation he could get the telephone only from the telephone company. The passenger who uses Indianapolis International Airport does not have to use the parking lot or a car rental agency; there are other ways of getting to and from the airport. But the existence of alternatives just limits—it does not destroy—the Authority's power to extract by indirection the profits that its locational monopoly makes possible. Its big surplus of concession income over the costs of providing space and other facilities and services to the concessionaires show this.

The Authority cites cases such as *FPC v. United Gas Pipe Line Co.*, 386 U.S. 237, 243, 87 S.Ct. 1003, 1007, 18 L.Ed.2d 18 (1967), for the proposition that a utility's income from unregulated activities (here, the concessions) should not be attributed to the regulated activities (the runways and other facilities used by the airlines). We have no quarrel with the proposition in the abstract but point out that implicit in it is the assumption that the customers for a utility's unregulated services are different people from the customers for its regulated services. If they are the same people, the utility can (if permitted) evade the regulatory ceiling on rates to its regulated customers by charging them excessive prices for the unregulated services they buy. This is what the Authority has tried to do here, since it is the airline passengers, in their capacity as patrons of the airport concessions, or the airlines, who will in the end bear the cost of the heavy rentals that the Authority has charged its concessionaires. This point was missed in *Raleigh-Durham Airport Authority v. Delta Air Lines, Inc.*, 429 F.Supp. 1069, 1079 (D.N.C. 1976), the only decision that supports the Authority's treatment of its concession revenues.

Actually, *United Gas Pipe Line Co.* strengthens our analysis. The issue there was whether, in deciding what cost of service allowance for federal income tax to permit a utility to take, the Federal Power Commission had to give the utility the allowance it would be entitled to if it filed a separate tax return, or could subtract the tax savings that the utility obtained by filing a consolidated return with affiliated corporations that were not regulated. The Court held that the latter course was proper, 386 U.S. at 243-45, 87 S.Ct. at 1007–08, even though it amounted to treating a tax savings obtained in part from unregulated activities as income to the regulated firm that had to be taken into account in setting its rates. In just the same way, the district judge here forced the airport authority to take account of concession rentals, nominally obtained from unregulated activities, in setting rates to the authority's regulated customers (the airline defendants).

An amicus curiae defends the Authority's approach as a method of preventing airport congestion. Suppose, it argues, the Authority's concession revenues rose to a level where they covered the airport's entire costs. Then, if our analysis is right, the landing fees and other charges to the airlines would have to be zero; the airlines would consequently have no incentive to economize on their use of the airport; and there would be congestion and resulting passenger delays that stiff landing fees could have avoided. But leaving aside the fact that the Authority introduced no evidence that the Indianapolis airport is crowded at the existing user fees (that is, the fees set in the expired leases), we point out that airport congestion is a problem of structure, not level, of rates. No airport is

congested all the time; congestion is a problem only at peak periods, such as Friday evenings. And the logical—we do not say the only—way to deal with congestion at peak periods is to charge a peak-period surcharge. See, e.g., 1 Kahn, *supra*, at 87–103. This is the point of Professor Eckert's criticism of airport financing, which the amicus curiae cites. See Eckert, Airports and Congestion 20–27 (1972). He does not advocate allowing airport authorities to extract revenues greater than their costs; he wants a system of variable landing fees to induce the airlines to economize on their use of airports and airways. See also Levine, *Landing Fees and the Airport Congestion Problem*, 12 J. Law & Econ. 79, 91, 102–03 (1969). We have said nothing to prevent the Indianapolis Airport Authority from charging higher landing fees at some times of the day or week or year than at others or shifting from a system of financing its operations out of a combination of landing fees and concession rentals to landing fees alone. And it is not true, or at least not inevitable, that if the Authority reduced or even eliminated concession rentals, the concessionaires would simply pocket the considerable sums that they now pay the airport in rentals, and airline passengers would be no better off than they are now. There is direct competition among many of the concessionaires, such as the car rental agencies; and there is competition to become a concessionaire. See *Omega Satellite Products Co. v. City of Indianapolis*, 694 F.2d 119, 126–27 (7th Cir.1982).

Now it is conceivable, even in a regime of total reliance on landing fees, that if the Authority raised its peak-period fees it might have to lower its fees at other times in order to avoid making its income from the airlines excessive overall. But that would simply reinforce the desired effect of the peak-period surcharge in redirecting traffic to less busy periods. Moreover, no offsetting reduction would be necessary if the peak-period surcharge did not generate additional revenue, and it might not. Its purpose would be to reduce flights at the peak period rather than to make money, and the reduction in number of flights might offset the increase in the landing fee per flight.

It is also conceivable, however, that no matter what the structure (as distinct from level) of landing fees, the airport or its airspace would become unduly congested. If high landing fees were offset by reductions in concession rentals that were passed on to the concessionaires' customers, the airport might become so attractive a place to travel to and from that it would be thronged with passengers despite the high ticket prices, reflecting high landing fees. In that unlikely event there would be an argument (we need not decide how compelling an argument) for allowing the airport to continue to charge those fees, even though it would obtain temporary monopoly profits by doing so, in order to limit usage and enable the airport to finance a rapid expansion of its facilities. See Levine, *supra*, at 88. But there is no suggestion that the Indianapolis airport is anywhere near that point.

 The Authority used an invalid method of calculating airline landing fees and must therefore go back to the drawing board. But unless there were a single valid method, we could not tell the Authority what fees it must charge; and no one says there is. We emphasize, too, that the powers of a federal court in regulating rates are more limited than those of an administrative agency. We can invalidate an unreasonable rate, but we cannot fix the reasonable rate; that is a legislative or administrative rather than a judicial function. *Reagan v. Farmers Loan & Trust Co.*, 154 U.S. 362, 397–98, 14 S.Ct. 1047, 1054, 38 L.Ed. 1014 (1894). We therefore do not hold that the Authority must use the "single cash register" approach, in which the entire airport is treated as a single cost center, rather than the "multiple cash register" approach, illustrated by this case, in which the airport is divided into different revenue-producing centers each of which must pay its own way. The vice of the ordinance, at least so far as the case before us is concerned, is not that it makes the

airlines pay the costs allocable to them, or even that it makes the concessionaires pay so much more than the costs allocable to *them* (for no concessionaires are parties to this suit); it is that, by a combination of airline user fees and concession rentals, the airport authority has imposed on the airlines and their passengers a cost for the use of the airport that greatly exceeds a reasonable estimate of the costs that the airlines impose on the airport.

 Although we need take no position on the single versus multiple "cash register" question we do need to consider three other objections that the airlines make to the ordinance, because they are independent of the Authority's refusal to take account of concession revenues in setting user fees. The first is that the ordinance should have allocated the costs of firefighting services in proportion to the number of fires experienced by each class of users of the airport's facilities over some reasonable period of time rather than mainly to the airlines. We disagree. The airport has elaborate firefighting facilities not in order to enable it to respond to a grease fire in a hamburger stand or a car fire in the parking lot but to protect the airlines and their passengers should a plane catch on fire in a crash or other accident. Airport costs that would not be avoided if a particular class of users stopped using the airport (i.e., the concessionaires) are not costs imposed on the airport by those users, and therefore are not properly allocable to them. Cf. *Illinois v. ICC*, 722 F.2d 1341, 1346 (7th Cir.1983). Thus the bulk of the firefighting costs are properly allocable to the airlines. On similar grounds we think the Authority introduced enough evidence—if barely enough—to support its allocation of security costs to the airlines, particularly in light of the absence of any contrary evidence introduced by the airlines. (This is a minor item; the costs of the anti-hijacking program are recovered in a separate fee to the airlines that is not contested.)

 The Authority allocated $400,000 of its costs to the airport's general-aviation users but charged no landing fee to them. It points out that the cost of collecting landing fees from general-aviation users would be very high—maybe as much as half the fee—and that in lieu of a landing fee it imposes a charge per gallon of aviation fuel consumed by general-aviation users at the airport. There is no objection to substituting a flowage fee (as it is called) for a landing fee in order to economize on the costs of collection, but the flowage fee must yield revenues commensurate with the costs allocated to general-aviation users. This flowage fee does not. It generates only $250,000 in revenues. Although the ordinance nearly doubled the landing fees and other charges to the airline users of the airport, it left unchanged the flowage fee that the Authority had been charging to general-aviation users since 1971. The difference in the Authority's treatment of airlines and private planes—making the former pay for the full costs (and more!) that they impose on the airport, but, through inaction, allowing the latter to get away with paying little more than half of the costs they impose—has not been justified. And since flights by private planes are more likely to be intrastate than airline flights are, the effect of leaving the flowage fee unchanged has been to shift some of the costs imposed by local users of the airport to its interstate users, who are, along with many of their customers, non-residents of Indiana. This is just the sort of discrimination Congress wanted to prevent in the Anti-Head-Tax Act.

 The only other issue that requires discussion is whether the airlines are holdover tenants. If they are, then whatever new ordinance the airport authority enacts in response to our decision will not be retroactive to the date of the expiration of the leases. Several early Indiana cases discussed in *Employers' Liability Assurance Co. v. Enos Coal Corp.*, 457 F.2d 402, 406–07 (7th Cir.1972), hold that if a tenant does not vacate the premises at the expiration of his lease but continues to make, and the landlord continues to accept, payment of the rental fixed in the lease,

the tenant is automatically a holdover tenant whose obligations to the landlord are discharged by payment of that rental. But a more recent case indicates that Indiana has come into line with the prevailing view that the presumption that the tenancy continues "may be rebutted by proof of a contrary intention on the part of the landlord alone ...." *Speiser v. Addis*, 411 N.E.2d 439, 441 (Ind.App.1980). Of course the Authority is wrong to argue that *Speiser*, a decision of the Indiana Appellate Court, "overruled" the earlier cases, which include two decisions of the Indiana Supreme Court, *Harry v. Harry*, 127 Ind. 91, 92, 26 N.E. 562 (1891), and *Lautman v. Miller*, 158 Ind. 382, 63 N.E. 761 (1902). But just as an intermediate federal appellate court may properly decline to follow a U.S. Supreme Court decision when convinced that the Court would overrule the decision if it had the opportunity to do so, see, e.g., *Norris v. United States*, 687 F.2d 899, 902–04 (7th Cir.1982); *Browder v. Gayle*, 142 F.Supp. 707, 717 (M.D.Ala.) (three-judge court), aff'd per curiam, 352 U.S. 903, 77 S.Ct. 145, 1 L.Ed.2d 114 (1956); *United States v. Girouard*, 149 F.2d 760, 765 (1st Cir.1945) (dissenting opinion), rev'd, 328 U.S. 61, 66 S.Ct. 826, 90 L.Ed. 1084 (1946), so may intermediate state appellate courts decline to follow earlier state supreme court decisions for the same reason—especially when almost a century has passed since the earlier decisions. And if we think the intermediate state appellate court has made a correct or even, perhaps, just a defensible prediction of what the state supreme court would do if the question were put to it, then we are bound to follow its ruling in a diversity case or any other case where the issue is one of state law. See, e.g., *Garris v. Schwartz*, 551 F.2d 156, 158 (7th Cir.1977); 19 Wright, Miller & Cooper, Federal Practice and Procedure § 4507 at pp. 94–95 (1982).

■ Although the usual way of creating a holdover tenancy is by an explicit communication from the landlord that he is electing to treat the tenant as a holdover,

"The conduct of the landlord ... may amount to an assertion of the right of election. This would be the case if an offer by the tenant to continue paying the usual rent was accepted without reservations." 2 Restatement (Second) of Property (Landlord and Tenant) § 14.4, comment e (1977). But here the rent was accepted with reservations. The Authority told the airlines that it would not extend the leases unless they agreed to substantial increases in the rental rate. The airlines knew that the Authority had the legal power unilaterally to impose new terms (provided they were reasonable). And beginning on September 1, 1980, when the ordinance went into effect, they were fully apprised of the Authority's position that the charges fixed in the ordinance were the rates that it would seek to collect from the airlines. By continuing to use the airport in these circumstances the airlines assumed the risk that either the ordinance would be held valid and they would have to pay the fees fixed in it or, if the ordinance was held invalid and some substitute enactment fixing reasonable fees was promulgated, they would have to pay those fees instead.

To summarize, we agree with the district judge that the ordinance is invalid in disregarding concession income and in continuing the old flowage fee for general-aviation users, but we disagree with some of his other conclusions and remand the case for further proceedings consistent with this opinion. The Authority raises some minor procedural and evidentiary issues in this appeal that are without merit and require no discussion. The parties shall bear their own costs in this court.

AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.

FLAUM, Circuit Judge, concurring.

I join in that portion of the majority opinion holding that the airlines were not holdover tenants under Indiana law. I agree with the majority's conclusion that the ordinances establishing user fees for

the Indianapolis International Airport[1] are invalid. However, I reach that result for reasons different from those of the majority, and thus, I concur only in the judgment as to the remaining issues.

## I

In this appeal, the Indianapolis Airport Authority has asked this court to require the airlines to pay the fees established in its ordinances for use of the airport. The airlines argue that the ordinances, and more particularly the user fees charged them under the ordinances, are invalid because the Airport Authority improperly allocated costs among airport users in setting the fees. In response to these arguments, the majority opinion informs the parties that the ordinances are invalid because the airport has a monopoly and extracts a monopoly price from the concessionaire users. The majority opinion argues that the ordinances are invalid because the fees charged to the concessionaire users are excessive, resulting in an unreasonable price being charged to airline passengers. There are several difficulties with this approach. First, whether the fees charged to the concessionaires are excessive is not at issue. No one, either at the district court or on appeal, has argued that the fees charged to the concessionaires are too high. The concessionaires are not parties to this action. The ordinances in question do not even apply to most of them.[2] Moreover, no one has argued, and there is no evidence in the record, that the total price charged to airline passengers is unreasonable. Second, the issue of monopoly was barely mentioned by the parties

below and on appeal.[3] The focus of the airlines' argument as to the unreasonableness of the fees was that costs and revenues were allocated improperly in setting the user fees. Third, and most significant, the approach taken by the majority does not address the issue of whether the costs allocated, and thus the fees charged, to the airlines are unreasonable. The majority finds the existence of a monopoly price because the rent charged to the concessionaires is more than three times the costs attributed to them under the Airport Authority's cost allocation method. This approach, however, assumes the very issue that we have been asked to decide—whether the costs were correctly allocated. If a larger percentage of the costs of the airport properly should have been allocated to the concessionaires, then the disparity between the rent and the costs would not be as great. The issue in this case is whether various federal and state laws prohibit the cost accounting method employed by the airport in setting the user fees charged to the airlines. I deem it appropriate to restrict a federal court's involvement with a municipal corporation's method of setting rates for the use of its property—for reasons of comity and judicial restraint—to the specific issues that are brought before the court.

Moreover, I believe that the majority opinion inappropriately relies on a statute that is unnecessary to its decision. The airlines challenge the ordinances on the basis of three statutes: section 18(a)(1) of the Airport and Airway Development Act of 1970, as amended, 49 U.S.C. § 1718(a)(1)

---

1. In addition to the Indianapolis International Airport, the Indianapolis Airport Authority operates four "reliever" general aviation airports. The fees charged at those airports are not at issue here.

2. The ordinances impose fees for: certain ground transportation concessions, namely buses, taxis and courtesy vehicles; the observation deck; mobile catering truck operators; and public and employee parking lots. It should be noted that the parking lots are not true "concessions," as they are owned and operated by the Airport Authority. However, because the lots

are a source of nonaeronautical revenue, they are treated as though they were a concession.

3. In a voluminous trial court record (consisting of over 800 pages of pleadings and over 1,100 pages of transcript), I could find only a handful of references to an argument that the airport has a monopoly. The balance of the record focused on the question of allocation of costs and revenues. Similarly, on appeal, there was no mention of monopoly in the parties' briefs. Moreover, the statistics cited by the majority to prove the airport's monopoly are not contained in the record before us.

[now codified at 49 U.S.C. § 2210(a)(1) (Supp.1982)]; the Federal Anti-Head Tax Act, 49 U.S.C. § 1513 (Supp. IV 1980) (prior to 1982 amendment); and section 8–22–3–11(9) of the Indiana Airport Authorities Act, Ind.Code Ann. §§ 8–22–3–1 to –35 (West 1982). All three statutes require the airport to charge "reasonable" fees. As the majority correctly notes, we need not decide whether the airlines have standing to raise the Airport and Airway Development Act of 1970. Because I would hold that the ordinances violate the Indiana statute, and because the federal Anti-Head Tax Act poses difficult and unresolved problems of interpretation, I would not and do not reach the question of whether the ordinances also violate the federal statute.[1] Thus, we need not decide whether "reasonable" under the Act means the same thing as it does under the Indiana statute.[5] Furthermore, section 1513(b) clearly applies only to fees charged to "aircraft operators." It does not apply to fees charged to concessionaires. The majority opinion thus has expanded the reach of the statute and created regulation of the market system where Congress clearly had no intent to regulate.

Finally, I see no need to discuss potential means of reducing airport congestion through rate-making methodology. Courts are not experts on the subject of airport management and financing. The parties have not asked for our advice on airport congestion.[6] The parties have not argued before this court that congestion is, or is even likely to be, a problem at Indianapolis International Airport. Until this matter is squarely presented to us as an issue necessary to a decision, we should not address it.

## II

Prior to September 1, 1980, the Airport Authority's charges to the airlines were set through leases negotiated with the airlines. In determining the fees to be charged, the Airport Authority totalled its operating and maintenance expenses plus the cost of its debt service and subtracted all revenues from airport users other than the airlines. The Airport Authority then set its fees in an amount sufficient to recover from the airlines the balance of the amount necessary to pay its expenses and debt service. Before the lease expired on August 31, 1980, the parties attempted to negotiate a new lease but were unable to do so. In August 1980, the Airport Authority passed ordinance 4–1980, which established fees and charges effective September 1, 1980. In December 1980, the Airport Authority passed ordinance 5–1980, which established fees and charges effective February 1, 1981.

In determining the fees to be set by the ordinances, the Authority relied on accounting reports prepared by its staff and the firm of Crenshaw & Associates ("Crenshaw Report"). The Crenshaw Report divided the airport into various cost centers. There were two types of cost centers: revenue-producing and nonrevenue-producing. Costs were then allocated among the cost centers. Costs from each revenue-producing cost center were charged to that specific center. Costs from nonrevenue-producing cost centers were allocated among rev-

---

**4.** In *Raleigh-Durham Airport Authority v. Delta Air Lines, Inc.,* 429 F.Supp. 1069 (E.D.N.C.1976), a case raising the issue of the reasonableness of airport user fees, the court based its decision solely on a state statute requiring reasonable charges.

**5.** Whether "reasonable" means the same thing under the Anti-Head Tax Act as it does under the Indiana statute is open to question. As discussed *infra,* a reasonable charge under the Indiana statute is one that reflects the extent of use of airport facilities by a user. Thus, the allocation of costs among users is a component of reasonableness. Arguably, the federal statute

merely restricts the airport's overall profit, while not imposing any restrictions on from whom costs may be recovered. *See* Note, Airline Deregulation and Airport Regulation, 93 Yale L.J. 319, 324 n. 35 (1983). *See also Island Aviation, Inc. v. Guam Airport Authority,* 562 F.Supp. 951, 959–60 (D.Guam 1982) (reasonable fee under § 1513(b) is one that reflects actual costs of facilities and is designed to make airport as self-sustaining as possible).

**6.** The impact of rate-making on airport congestion was raised in the Brief of Various Public Airport Authorities, *Amici Curiae* at 13–16.

enue-producing cost centers using one of two methods: management analysis or revenue acres. Under the management analysis method, airport management determined what percentage of the costs benefitted the users of each revenue-producing cost center and then allocated the costs accordingly. Under the revenue acres method, costs were allocated strictly according to the space occupied by each revenue-producing cost center.

Costs were then allocated among the users of each revenue-producing cost center. The concessionaires were considered to be users only of the terminal building cost center, and thus they were allocated costs solely from that cost center. The parking lot was considered to be a user only of the parking lot cost center, and thus it was allocated costs solely from that cost center. Users were divided into two classes: aeronautical and nonaeronautical. Aeronautical users were charged at a rate to recover the costs attributed to them. Nonaeronautical users were charged market rates, with their attributed costs serving as a minimum.

In determining how to assess fees against aeronautical users, the Airport Authority divided the users into classes. Commercial airline users' fees were assessed through rental and landing fees. General aviation users' fees were assessed through a fuel flowage fee. That fee had not been raised since 1971. The costs allocated to general aviation totalled over $400,000. The fuel flowage fee recovered approximately $250,000.

The ordinances increased the rates charged to the airlines. Under the lease, the airlines paid $.46 per thousand pounds gross landing weight and $17.55 per square foot for rent in the terminal. Under ordinance 4–1980, the airlines were to pay $.6015 per thousand pounds gross landing weight and $21.95 per square foot in rent. Under ordinance 5–1980, the landing fee

was increased to $.6771 per thousand pounds gross landing weight. Under the ordinances, the airport was budgeted to have net income of $2,917,129 for 1981. After September 1, 1980, the airlines continued to pay both rent and landing fees at the rates imposed under the expired leases.

The district court, following a bench trial, ruled that the rates and charges established by the ordinances were unreasonable because the Airport Authority's method of allocating costs and revenues failed to recognize interdependencies between aeronautical and nonaeronautical users. The court further held that the rates discriminated against the airlines and in favor of general aviation.[7] Finally, the court held that the airlines were holdover tenants under Indiana law, and as such, the Airport Authority by accepting rent from them had waived its right to the rent imposed by the ordinances.

On appeal, the Airport Authority argues that the district court erred in holding that its rates and fees under the ordinances were unreasonable. It contends that the district court's opinion improperly forces it to use revenues from nonaeronautical users to subsidize the airlines. The Airport Authority argues that it has broad discretion in adopting its rate-making methodology. It further maintains that the general aviation flowage fees were not discriminatory, because it can use different methods to collect fees from different classes of users.

The airlines argue that the district court properly found that the accounting method was improper and that the Airport Authority misapplied its own improper methodology. They argue that the general aviation fee was discriminatory because it failed to recover the costs attributable to general aviation.

---

7. The district court relied in part on both federal statutes in reaching its conclusions. This does not preclude this court from basing its decision solely on the Indiana statute. This court may affirm a district court's conclusions on grounds other than those relied upon by the lower court where the district court used incorrect reasoning. *Beach v. Owens-Corning Fiberglas Corp.,* 728 F.2d 407, 408 n. 1 (7th Cir.1984).

## III

The Indiana Airport Authorities Act provides that an airport authority board "máy do all acts necessary or reasonably incident to carrying out the purposes of this chapter, including the following: ... To adopt a schedule of reasonable charges and to collect them from all users of facilities and services within the district ..." Ind.Code Ann. § 8–22–3–11(9) (West 1982). Under the statute, a reasonable charge is one that reflects the differences in the extent of use of airport facilities by different classes of users. *Evansville-Vanderburgh Airport Authority District v. Delta Air Lines, Inc.*, 259 Ind. 464, 467, 288 N.E.2d 136, 137 (1972). As the court noted, "The very concept of a user fee implies that there are different uses that can be identified and the amount of the fee charged must relate to that use." *Id.*, 288 N.E.2d at 137. Thus, the amount of the fee charged must relate to the benefits supplied to the user, measured according to the costs incurred in supplying the benefits.[8]

This conclusion has two important corollaries. First, the fee charged to one user cannot relate to costs incurred in supplying benefits to those other than that user. Second, each user or class of users must bear its full share of the costs of its benefits. Violation of either principle would lead to a fee that is unreasonable under Indiana law.

Applying these principles, I find that, as a matter of law, the rates imposed by the ordinances are unreasonable. First, the fees charged to the airlines reflect the cost of benefits fairly attributable to other users of the airport. Second, the fees fail to reflect the extent of use by the users.

One benefit not reflected in the fees charged to the concessionaires is the production of customers for the parking lot and concessions. The parties agree that the persons using the airport parking lot and concessions are airline passengers. Thus, there is a dependence on the airlines by the concessionaire users. *Cf. Raleigh-Durham Airport Authority v. Delta Air Lines, Inc.*, 429 F.Supp. 1069, 1083 (E.D.N. C.1976) ("[t]he authority is directly dependent on the inflow and outflow of commercial passengers and freight, as served by the airlines, to provide the people—traffic who use a majority of such services as restaurant, parking space, ticket counter, concessions, etc."). Daniel C. Orcutt, Executive Director of the airport, testified that "[t]he airport provides an economic opportunity for these companies to conduct their business, and they are willing to pay more than the cost for that opportunity, to have the exposure to the traffic." Transcript at 208. The dependence of the nonaeronautical users on the airlines to produce customers means that those users receive a substantial benefit from the airlines. The costs of producing that benefit, however, are borne entirely by the airlines. Under the Indiana statute, that is unreasonable.[9] There was testimony at the trial about several different cost accounting methods that the Airport Authority could use to recognize that dependency, such as the by-product and joint-product methods. It is, of course, unnecessary for this court or the district court to endorse any particular method.

Second, the fuel flowage fee charged to general aviation users did not recover the costs allocated to general aviation. The

---

**8.** The measurement is the cost of the benefit supplied, not the value of the benefit. Courts are ill-equipped to determine the value of particular benefits accorded to airport users. *See American Airlines, Inc. v. Massachusetts Port Authority*, 560 F.2d 1036, 1038 (1st Cir.1977).

**9.** For example, in the airport terminal building cost center, the total cost attributable to the cost center was calculated. It was then allocated among the users (the various airlines and the various concessions) according to square foot-

age occupied by each user. Thus, the rental charge to the concession users ignores the costs of producing the customer flow. Similarly, the Airport Authority treated the passenger parking lot as a separate cost center. Thus, the only costs allocated to it were the direct costs of operating the parking lot and a percentage of indirect costs allocated under the revenue acres and management analysis methods. The parking lot cost center was not charged with any of the costs of producing its own customers.

statute requires that the fee be related to the costs of the services provided and be determined according to the extent of the use. The fee charged here fails to meet that standard, and thus it is unreasonable. However, nothing in the statute requires that all users be assessed according to the same formula or that costs be collected in the same manner. The Airport Authority may collect fees from general aviation through a fuel flowage fee rather than through a landing fee; but however it chooses to collect its fee, that fee must recover the costs properly allocable to that user.

Third, the Airport Authority, in determining its cost centers, included in the landing area cost center both land that was not part of the clear zone for any existing runway and land that was at that time not even owned by the airport.[10] This had the effect of increasing the size of the landing area cost center and thus of the amount allocated to that cost center under the revenue acres method. The users of that cost center—the commercial airlines—were thus charged with costs that had no relation to the extent of their use of the airport. This is unreasonable.[11]

The airport firefighting costs were allocated according to management analysis. Although the majority of the firefighting activity took place in the terminal building, most of the costs were allocated to the airfield. The Airport Authority argues that this is because the firefighting equipment and personnel are required in case there is a major aircraft disaster, not to deal with the minor emergencies that occur in the terminal building. This analysis is reasonable under the statute, because it relates the costs to the extent of the use.

IV

Both in the district court and on appeal, the Airport Authority has characterized the dispute over cost accounting methods as a choice between the "single cash register method" and the "multiple cash register method." In the former, the airport is treated as one cost center and revenues from the nonaeronautical users are applied to lower the fees charged to the airlines. In the latter, the airport is treated as a series of cost centers, each of which must stand alone for rate-making purposes. The Airport Authority contends that the district court opinion would force it to apply the single cash register method. I do not understand the district court opinion to require this, and I would not so hold. The Indianapolis Airport Authority may establish as many cost centers as it deems prudent; but it must allocate the costs among them, and among the users of a cost center, fairly. *See Raleigh-Durham Airport Authority v. Delta Air Lines, Inc.,* 429 F.Supp. at 1079 (a multiple cash register system is a reasonable method of allocating costs if it is fairly and regularly applied).

Requiring the Airport Authority to consider dependencies in allocating costs does not violate the rule of public utility rate-making that revenues from unregulated activities cannot be used to subsidize regulated activities. *See Smyth v. Ames,* 169 U.S. 466, 18 S.Ct. 418, 42 L.Ed. 819 (1898). Instead, it merely requires a fair allocation of costs in determining the revenues of the activities. Moreover, under the Indiana statute the fees charged to concessionaires are regulated. The Indiana Supreme Court has recognized that concessions are "users" of an airport within the meaning of section 8–22–3–11(9). *Evansville-Vanderburgh Airport Authority District v. Delta*

---

**10.** The Airport Authority included land that will be in the clear zone of a future runway and land currently in a trailer park that the Airport Authority has been trying to acquire for several years. The parties have not informed this court of the current status of the acquisition efforts.

**11.** The district court, in its opinion, found the inclusion of land unreasonable because it resulted in prefunding of capital expenditures. It is

clear from the record that the Airport Authority was not seeking to prefund the capital expenditures; no costs for acquisition or construction of a future runway or purchase of the trailer park were included in the rate base. However, its inclusion of the land in the cost center may still be found unreasonable on different grounds. *See supra* note 7.

*Air Lines, Inc.,* 259 Ind. at 466–67, 288 N.E.2d at 137.

### V

Because I agree with the majority opinion that the airlines were not holdover tenants under Indiana law, I also agree that the case must be remanded to the district court for further proceedings.